**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WELLNESS MATRIX GROUP, INC., et al.<br><br>Defendants. | Case No. 8:21-cv-01031-SSS-DFMx<br><br>**ORDER GRANTING MOTION FOR DEFAULT JUDGMENT, [DKT. 59], AND GRANTING, IN PART, MOTION FOR FINAL JUDGMENT, [DKT. 62]** |

Before the Court are two motions filed by Plaintiff United States Securities and Exchange Commission ("SEC"). [Dkt. 59, 62]. The first is a motion for entry of default judgment against Defendant Wellness Matrix Group, Inc. ("Wellness Matrix") for violating Section 10(b) of the Securities Exchange Act and Rule 10b-5. [Dkt. 59]. Wellness Matrix has not appeared in this case; thus, the motion is unopposed. The second is a motion final judgment against Defendant George Todt ("Todt"). [Dkt. 62]. Todt does not oppose.

Having reviewed the SEC's arguments, relevant legal authority, and record in this case, the motion for default judgment against Wellness Matrix is

**GRANTED,** and the motion for final judgment against Todt is **GRANTED, IN PART**.

# I. MOTION FOR DEFAULT JUDGMENT AGAINST WELLNESS MATRIX

The Court first turns to the SEC's motion for default judgment against Wellness Matrix.

## A. Background

### 1. Wellness Matrix's fraudulent and deceptive representations

This case is about Wellness Matrix's fraudulent and deceptive representations about its purported COVID-19 home test kits and disinfectant in connection with the sale of its stocks. Wellness Matrix is a company whose purpose is "to develop and implement the most advanced technologies available to provide advanced healthcare and to provide advanced systems and platforms to allow customers to have access to the most secure data storage and records security available." [Dkt. 1, Compl. ¶ 13]. In 2018, Wellness Matrix's CEO agreed to sell the company to Todt. [*Id.* ¶ 20]. Wellness Matrix's CEO allowed Todt to run the day-to-day operations of the company. [*Id.* ¶¶ 19, 21].

Beginning in February 2020, Todt began receiving information about COVID-19-related products Wellness Matrix could market. [*Id.* ¶ 25]. One of these products was a COVID-19 antiviral disinfectant distributed by CoronaCide, LLC ("CoronaCide"), which claimed to effectively kill COVID-19 for 28 days. [*See id.* ¶¶ 25-26, 31]. Around this time, Todt and his ex-wife registered three website domains: coronastop28.com, stopcorona28.com, and virastop28.com. [*Id.* ¶ 27]. In mid-March 2020, Todt learned of a COVID-19 home test kit distributed by CoronaCide. [*Id.* ¶ 28]. CoronaCide's test kits warned that they were only for in vitro or emergency purposes. [*Id.*]. Soon after learning about the test kits, Wellness Matrix, at Todt's direction, opened up

a payment processing account to receive payments from consumers for the test kits and disinfectant. [*Id.* ¶ 29].

On March 19, 2020, a CoronaCide associate sent Todt a letter from the Federal Drug Administration ("FDA"). [*Id.* ¶ 30]. The FDA stated it received the CoronaCide test kit submission and would notify CoronaCide once its review was completed. [*Id.*]. The FDA did not indicate, however, that the CoronaCide's test kits were approved for any use. [*Id.*]. The next day, Todt sent a Wellness Matrix purchase order to CoronaCide for about $10,000 of test kits and disinfectant. [*Id.* ¶ 31]. A CoronaCide associate notified Todt the order could not be fulfilled because the test kits could only to be sold to governments in bulk at that time. [*Id.*]. This information was later confirmed in another email to Todt. [*Id.*]

On Wellness Matrix's behalf, Todt directed an associate of his to add information about the test kits and disinfectant to two of Wellness Matrix's affiliated websites—namely, stopcorna28.com and virastop28.com. [*Id.* ¶ 32]. Todt specifically told the associate to include the FDA submission number for the CoronaCide test kits and to indicate the products were Wellness Matrix's. [*Id.*]. Wellness Matrix included a banner on the front page of its main website that directed viewers to "Visit CoronaStop28.com." [*Id.* ¶ 34].

Between March 19 and 31, 2020, Wellness Matrix advertised for sale CoronaCide's products as a "WMGR" product through its affiliated website domains and through Todt's personal social media accounts. [*Id.* ¶¶ 35-36, 41-42]. During this 12-day period, Wellness Matrix advertised the test kits as FDA-approved for at least three days and advertised them as FDA-registered and -authorized for two other days. [*Id.* ¶ 38]. Wellness Matrix advertised the disinfectant was approved or registered by the Environmental Protection Agency ("EPA"), citing a purported registration number. [*Id.* ¶ 40]. Wellness

-3-

Matrix and Todt knew the test kits and disinfectant were not government approved, authorized, or registered. [*Id.* ¶¶ 45, 47-48].

### 2. The investors

Shortly after learning about the disinfectant, Todt spoke to a then-prospective investor in late February 2020. [*Id.* ¶ 49]. Todt told the investor to purchase Wellness Matrix shares because it had an EPA-approved disinfectant to stop the spread of COVID-19. [*Id.*]. Todt further told the investor that the federal government and Amazon expressed interest in the disinfectant. [*Id.* ¶ 50]. This product could increase Wellness Matrix's stock price, Todt continued, from $0.05 to $20 per share. [*Id.*]. Todt told the investor he was an owner of Wellness Matrix and showed him coronastop28.com, which he said was affiliated with Wellness Matrix. [*Id.* ¶ 51]. The next day, Todt told the investor that Wellness Matrix had sold 10,000 units of the disinfectant to Costco. [*Id.* ¶ 52]. The investor periodically reviewed coronastop28.com and noticed that documentation was added to support Wellness Matrix purported test kits and disinfectant. [*Id.* ¶ 53].

Relying on the information he learned from Todt and from Wellness Matrix's own and its affiliated websites, the investor purchased over 23,000 shares of Wellness Matrix between March 6 and 24, 2020. [*Id.* ¶ 56]. The investor convinced his sister to invest in Wellness Matrix, resulting in her purchasing 5,000 shares of Wellness Matrix on March 26, 2020. [*Id.* ¶ 57].

Things took a turn for the worse the following month. In April 2020, National Public Radio investigated Wellness Matrix's sales of the test kits and reported that several customers who ordered test kits did not receive them, and the FDA had not authorized any at-home COVID-19 test kit. [*Id.* ¶ 67]. Five days later, the SEC suspended trading in Wellness Matrix's securities because of questions regarding the accuracy and adequacy of information in the

marketplace since March 19, 2020. [*Id.* ¶ 68]. The two investors eventually sold their shares at a loss. [*Id.* ¶ 58].

### 3. The fluctuation in Wellness Matrix's share price

In the three months before Wellness Matrix began advertising the test kit and disinfectant, the company's share price fluctuated between $0.025 and $0.053, with an average daily trading volume of 28,100 shares for the three-month period. [*Id.* ¶ 59]. After Wellness Matrix began advertising the products, Wellness Matrix's share price increased. [*See id.* ¶¶ 61-62]. For example, on February 25, 2020, Wellness Matrix's share price increased and fluctuated between $0.05 and $0.10 with an increased trading volume of 194,055 shares. [*Id.* ¶ 61]. And between February 25 through April 6, 2020, Wellness Matrix's share price fluctuated between $0.035 and $0.19, with an average trading volume of about 85,000 shares. [*Id.* ¶ 62].

### B. Procedural History

On February 10, 2023, the SEC filed a Complaint against Wellness Matrix, alleging it violated Section 10(b) of the Securities Exchange Act and Rule 10b-5. [Dkt. 1]. The SEC served the summons and Complaint on Wellness Matrix on June 23, 2021. [Dkt. 15]. After failing to appear in this case, the Clerk entered default against Wellness Matrix on July 30, 2021. [Dkt. 20]. The SEC now moves for default judgment against Wellness Matrix. [Dkt. 59].

### C. Legal Standard

A court may enter default judgment against a defendant who has failed to plead or otherwise defend against an action after the clerk enters default. Fed. R. Civ. P. 55(b)(2). "The district court's decision whether to enter default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Seven factors—colloquially known as the *Eitel* factors—guide this discretionary decision: "(1) the possibility of prejudice to the plaintiff, (2) the

merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). The facts in the complaint are taken as true and deemed admitted by virtue of the entry of default, except those regarding damages. *See* Fed. R. Civ. P. 8(b)(6); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).

### D. Discussion

#### 1. Procedural compliance with Local Rule 55-1

As a threshold matter, the Court must determine whether the SEC has complied with the procedural requirements of Local Rule 55-1, which coextensively governs applications for default judgment made to the Court. Under this rule, an applicant must submit a declaration attesting to the following: (1) "[w]hen and against what party the default was entered"; (2) [t]he identification of the pleading to which default was entered; (3) "[w]hether the defaulting party is an infant or incompetent person"; (4) "[t]hat the Servicemembers Civil Relief Act (50 U.S.C. App. § 521) does not apply"; and (5) "[t]hat notice has been served on the defaulting party, if required by [Federal Rule of Civil Procedure 55(b)(2)]." C.D. Cal. R. 55-1.

The SEC has satisfied these procedural requirements. In support of its motion for default judgment, the SEC offers a declaration from Alyssa A. Qualls, Senior Trial Counsel for the SEC. [Dkt. 61, Decl. of Alyssa A. Qualls ("Qualls Decl.")]. Qualls attests default was entered against Wellness Matrix on July 30, 2021, after it failed to respond to the Complaint or otherwise appear in this case. [*Id.* ¶¶ 3-5]. Quall further attests Wellness Matrix is not an infant or incompetent person. [*Id.* ¶ 6]. Quall attests the Servicemembers Civil Relief

Act does not apply. [*Id.* ¶ 7]. And Quall attests notice was given via email to Wellness Matrix's CEO about the SEC's intent to move for default judgment under Federal Rule of Civil Procedure 55(b)(2). [*Id.* ¶ 9].

### 2. The *Eitel* Factors

Having satisfied Local Rule 55-1's procedural requirements, the Court must now decide whether entry of default judgment against Wellness Matrix is appropriate by weighing the seven *Eitel* factors.

#### i. Prejudice to the SEC

The first *Eitel* factor considers the possibility the SEC will suffer prejudice if default judgment is not entered. *Eitel*, 782 F.2d at 1471. Here, the SEC will suffer prejudice because it has no other recourse for recovery if default judgment is not entered. *See also Sec. and Exch. Comm'n v. Harrison*, No. 8:21-cv-01610-SPG-DFM, 2022 WL 17327325, at *4 (C.D. Cal. Oct. 4, 2022); *Sec. and Exch. Comm'n v. Baccam*, No. ED CV 17-0172 SJO (SPx), 2017 WL 5952168, *4 (C.D. Cal. June 14, 2017).

Accordingly, this factor weighs in favor of entering default judgment.

#### ii. Merits of the SEC's claim and sufficiency of the Complaint's allegations

Often considered together, the second and third *Eitel* factors assess the merits of the SEC's claim by addressing whether it has adequately alleged facts to state claim under Section 10(b) and Rule 10b-5 against Wellness Matrix. *Eitel*, 782 F.2d at 1471; *U.S. Sec. and Exch. Comm'n v. C3 Int'l, Inc.*, No. 8:21-CV-01586-CAS (PDx), 2022 WL 16814859, at *4 (C.D. Cal. Nov. 7, 2022). The facts in the Complaint are taken as true and deemed admitted, except those regarding damages. *Televideo*, 826 F.2d at 917-18.

Section 10(b) together with Rule 10b-5 makes it unlawful for a person to engage in fraudulent or deceptive conduct in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To prevail on a

-7-

claim under Section 10(b) and Rule 10b-5, the SEC must show (1) Wellness Matrix made a material misrepresentation or omission (2) in connection with the purchase or sale of a security (3) with scienter (4) by means of interstate commerce.  *Sec. and Exch. Comm'n v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011).

      The SEC adequately states a claim for a violation of Section 10(b) and Rule 10b-5 against Wellness Matrix.  The COVID-19 pandemic was a period filled with uncertainty and consternation.  Exploiting this situation, Wellness Matrix advertised for sale its purported COVID-19 test kits and disinfectant and advertised these products were registered, authorized, or approved by the federal government.  Wellness Matrix acted with a high degree of scienter, knowing these representations were false.  On behalf of Wellness Matrix, Todt repeated these representations, along with others, to a then-prospective investor, convincing him these two products could increase the company's share price.  Relying on Wellness Matrix's fraudulent and deceptive representations, two investors were induced to purchase Wellness Matrix shares.  The SEC thus adequately alleges facts to state a claim for a violation of Section 10(b) and Rule 10b-5.

      Accordingly, these two factors weigh in favor of entering default judgment.

            iii.    Sum of money at stake

      The fourth *Eitel* factor balances the amount of money at stake relative to the seriousness of Wellness Matrix's conduct.  *Eitel*, 782 F.2d at 1471; *C3 Int'l*, 2022 WL 16814859, at *6.  If the money at stake is proportional to Wellness Matrix's fraudulent and deceptive conduct, this factor will weigh in favor of entering default judgment.  *Baccam*, 2017 WL 5952168, at *7.

      Here, the SEC seeks a third-tier civil penalty of $100,000 from Wellness Matrix.  15 U.S.C. § 78u(d)(3)(B)(iii)(aa).  After accounting for inflation, the

-8-

third tier provides for a maximum penalty of $1,116,140 for each violation of Section 10(b) and Rule 10b-5 if the underlying conduct involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii)(aa)-(bb); 17 C.F.R. § 201.1001(b).[1]  There is no doubt Wellness Matrix engaged in fraudulent and deceptive advertising of its purported COVID-19 products to induce investors to purchase Wellness Matrix's shares, which at the least, created a significant risk of substantial loss to investors. A $100,000 civil penalty—a mere fraction of the maximum penalty allowed—is proportional to Wellness Matrix's fraudulent and deceptive conduct.

Accordingly, this factor weighs in favor of entering default judgment.

              iv.    Possibility of a dispute about the material facts

The fifth *Eitel* factor considers the possibility of a dispute about Wellness Matrix's fraudulent and deceptive conduct. *Eitel*, 782 F.2d at 1471-72. Again, the facts in the Complaint are taken as true and deemed admitted, except those regarding damages. Fed. R. Civ. P. 8(b)(6); *Televideo*, 826 F.2d at 917-18.

Here, because Wellness Matrix failed to file an answer, the Court deems admitted and true the SEC's allegations that Wellness Matrix engaged in fraudulent and deceptive conduct in violation of Section 10(b) and Rule 10b-5. There remains no possibility of a dispute about these material facts.

Accordingly, this factor weighs in favor of entering default judgment.

---

[1] *See also* Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2023), available at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm.

       v.      Possibility default was due to excusable neglect

The sixth *Eitel* factor considers the possibility that the entry of default was due to Wellness Matrix's excusable neglect. *Eitel*, 782 F.2d at 1472. This possibility is doubtful here. Wellness Matrix was served with the summons and Complaint on June 23, 2021. After failing to respond to the Complaint, the SEC served Wellness Matrix with its application for entry of default on July 29, 2021, and default was entered the next day. Five hundred eighty-four days elapsed without any response or filings from Wellness Matrix. On March 6, 2023, Qualls emailed Wellness Matrix's CEO expressing the SEC's intent to apply for default judgment. [Qualls Decl. Ex. 1]. Unsurprisingly, Wellness Matrix did not respond to the email. [*Id.* ¶ 10]. Despite having been served with a copy of this motion for default judgment, Wellness Matrix did not file a response. Based on Wellness Matrix's history of inaction in this case, it is doubtful that entry of default was due to its excusable neglect.

Accordingly, this factor weighs in favor of entering default judgment.

       vi.      Strong policy favoring a decision on the merits

The seventh *Eitel* factor requires this Court to account for the strong policy favoring that this case be resolved on the merits. *Eitel*, 782 F.2d at 1472. However, the very existence of Federal Rule of Civil Procedure 55(b) suggests this policy alone is not dispositive. *C3 Int'l*, 2022 WL 16814859, at *7.

Here, a decision on the merits is impractical, if not impossible, because Wellness Matrix has failed to response to the allegations in the Complaint. *Baccam*, 2017 WL 5952168, at *8. Accordingly, this factor does not weigh in favor or against entering default judgment.

       vii.      Balancing the *Eitel f*actors

Having considered and balanced the seven *Eitel* factors, the Court finds six of the seven factors weigh in favor of entering default judgment against

1   Wellness Matrix. The SEC's application for entry of default judgment is
2   **GRANTED**.

### 3. Terms of the Judgment

The Court must now decide the terms of the judgment against Wellness Matrix. The SEC requests that the Court (1) permanently enjoin Wellness Matrix from violating Section 10(b) and Rule 10b-5 in the future, and (2) impose a $100,000 civil penalty. The Court addresses each term below.

#### i. Permanent injunction

The Court has the authority to permanently enjoin Wellness Matrix from engaging in future conduct that would violate Section 10(b) and Rule 10b-5. 15 U.S.C. § 78u(d)(1). To obtain a permanent injunction, the SEC must show there is a reasonable likelihood that Wellness Matrix will violate Section 10(b) and Rule 10b-5 in the future. *Sec. and Exch. Comm'n v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). In assessing the likelihood of future violations, the Court must look at the totality of the circumstances surrounding Wellness Matrix and its violations. *Id.* Past securities violations may give rise to an inference there will be future violations. *Id.* Additional relevant considerations—otherwise known as the *Murphy* factors—include "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." *Id.*

There is a reasonable likelihood Wellness Matrix will violate Section 10(b) and Rule 10b-5 in the future. Wellness Matrix advertised CoranaCide's test kits and disinfectant as its own and represented them as government approved. It knew, however, that it did not actually own the product, that it could not fulfill any purchase orders, and that the products were not approved by the federal government. Wellness Matrix fails to acknowledge the

-11-

wrongfulness of its conduct and fails to provide any assurance it will not violate Section 10(b) and Rule 10b-5 in the future. Based on these circumstances, the Court finds it appropriate to permanently enjoin Wellness Matrix from engaging in conduct that would violate Section 10(b) and Rule 10b-5.

ii. Civil penalty

The SEC seeks a third-tier penalty for $100,000 against Wellness Matrix. Civil penalties are designed to deter wrongdoers from engaging in similar violations in the future. *C3 Int'l*, 2022 WL 16814859, at *9. The Securities Exchange Act provides three escalating tiers of penalties for a violation of Section 10(B) and Rule 10b-5. 15 U.S.C. § 78u(d)(3)(B)(i)-(iii). As noted above, the third-tier provides for a maximum penalty of $1,116, 140 against Wellness Matrix for each of violation of Section 10(b) and Rule 10b-5. 15 U.S.C. § 78u(d)(3)(B)(iii)(aa); 17 C.F.R. § 201.1001(b). Such a penalty is appropriate where the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii)(aa)-(bb). The *Murphy* factors that guide the consideration of whether to enter a permanent injunction apply equally to the Court's decision to impose civil penalties. *C3 Int'l*, 2022 WL 16814859, at *9; *see also Murphy*, 626 F.2d at 655.

For the same reasons justifying entering a permanent injunction, *see* discussion *supra* Section I.D.3.i, a $100,000 civil penalty against Wellness Matrix is appropriate here.

///
///
///
///
///

### E. Conclusion

For the above reasons, the SEC's motion for default judgment is **GRANTED**. The Court will issue a separate judgment.

## II. MOTION FOR FINAL JUDGMENT AGAINST TODT

On October 21, 2022, the Court granted the SEC's motion for summary judgment against Todt, concluding he engaged fraudulent and deceptive conduct that violated Section 10(b) and Rule 10b-5. [Dkt. 54]. The SEC now moves for final judgment against Todt. [Dkt. 62]. The SEC specifically requests that the Court (1) enter a new permanent injunction; (2) enter a conduct-based injunction; (3) bar Todt from being able to serve as an officer or director; (4) bar Todt from engaging in any conduct involving a penny stock; and (5) impose a civil penalty.

Because the SEC is familiar with the facts, which have been extensively detailed in the Court's order granting the motion for summary judgment, the Court will not recite them here. The Court will provide only those facts necessary to the analysis below.

### A. New Permanent Injunction

The SEC moves the Court to enter a new permanent injunction that would prohibit Todt from violating Section 10(b) and Rule 10b-5. As noted above, the Court can permanently enjoin Todt from engaging in future conduct that would violate Section 10(b) and Rule10b-5. 15 U.S.C. § 78u(d)(1). To obtain a permanent injunction, the SEC must show there is a reasonable likelihood that Todt will violate Section 10(b) and Rule 10b-5 in the future. *Murphy*, 626 F.2d at 655. The Court considers the totality of the circumstances with guidance from the *Murphy* factors. *Id.*

There is a reasonable likelihood Todt will violate Section 10(b) and Rule 10b-5 in the future. To begin, this is not the first time Todt has committed a securities violation. In an unrelated case from 2005, District Judge Percy

Anderson permanently enjoined Todt from engaging in conduct that would violate Section 10(b) and Rule 10b-5 for orchestrating two fraudulent schemes involving the sale and distribution of stocks. *See Secs. and Exch. Comm'n v. Todt*, No. 2:05-cv-03697-PA-PJW (C.D. Cal. Oct. 3, 2005) (Dkt. 80). Notwithstanding that permanent injunction, Todt engaged in another fraudulent and deceptive scheme, advertising the test kits and disinfectant as Wellness Matrix products and having government approval, authorization, or registration. [*See* Dkt. 54 at 7]. Todt used these misrepresentations to induce at least two investors to purchase Wellness Matrix shares. [*Id.* at 2]. Todt fails to acknowledge the wrongfulness of his conduct and fails to provide any assurances he will not violate Section 10(b) and Rule 10b-5 in the future. These circumstances justify permanently enjoining Todt from engaging in conduct that would violate Section 10(b) and Rule 10b-5.

### B. Conduct-Based Injunction

The SEC also moves the Court to permanently enjoin Todt from directly or indirectly participating in the issuance, purchase, offer, or sale of any security. According to the SEC, this conduct-based injunction will "not prevent Todt from purchasing or selling securities listed on a national securities exchange for his own personal account." [Dkt. 63 at 5].

The Court has broad discretion to fashion "any equitable relief that may be appropriate or necessary for the benefit of investors," including a conduct-based injunction. 15 U.S.C. § 78u(d)(5); *Sec. and Exch. Comm'n v. Moleski*, No. 2:21-cv-01065-SVW-E, 2021 WL 6752254, at *5 (C.D. Cal. Oct. 21, 2021). As is true with any injunction, the SEC must show there is a reasonable likelihood that Todt will engage in the conduct the injunction seeks to prohibit. *Murphy*, 626 F.2d at 655.

For the exact same reasons discussed above in Section II.A, an injunction that prohibits Todt from directly or indirectly participating in the issuance, purchase, offer, or sale of any security is appropriate here.

### C. Officer and Director Bar

The SEC moves the Court to bar Todt from serving as an officer and director for a public company. The lack of qualifying language in the SEC's motion suggests it asks that this bar be permanent and unconditional.

The Court may prohibit any person from serving as an officer or director of a public company if that person's misconduct demonstrated unfitness to serve as an officer or director. 15 U.S.C. § 78u(d)(2). The Court may consider the following factors to determine whether to impose an officer and director bar: (1) the egregiousness of Todt's securities law violation; (2) whether Todt is a repeat offender; (3) Todt's role or position when he engaged in the fraud; (4) the degree of scienter; (5) Todt's economic stake; and (6) the likelihood Todt will engage in future misconduct. *Sec. and Exch. Comm'n v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998). A court should also consider "whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years)" would be sufficient to prevent future securities law violations. *Sec. and Exch. Comm'n v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995); *see also* 15 U.S.C. § 78u(d)(2).

An officer or director bar is appropriate here. Todt engaged in egregious conduct, exploiting the uncertain nature of COVID-19 by marketing products that were unavailable and were not approved by the government, all to induce investors to purchase Wellness Matrix shares. Although Todt did not technically serve as an officer or director, he was a controlling shareholder of Wellness Matrix and effectively served as a quasi-officer or quasi-director because he was authorized to run the company's day-to-day operations. Given these facts coupled with Todt's history of engaging in fraudulent schemes, there

is a significant likelihood he will violate securities laws in the future. A permanent, unconditional officer and director bar against Todt is appropriate here.

### D. Penny Stock Bar

The SEC also moves the Court to bar Todt from participating in offering penny stocks in the future. Again, the lack of qualifying language in the SEC's motion suggests it asks that this bar be permanent and unconditional.

A penny stock is any equity security other than certain statutorily identified securities. 15 U.S.C. § 78c; 17 C.F.R. § 240.3a51-1. The Court may prohibit Todt from participating in an offering of penny stock if he engaged in such conduct at the time of the alleged violation. *Id.* § 78u(d)(6)(A). These bars may be conditional or unconditional and may be permanent or for a limited period. *Id.* The Court considers the same factors that help determine whether to impose an officer and director bar when deciding whether to impose a penny stock bar. *Sec. and Exch. Comm'n v. Premier Holding Corp.*, No. SACV 18-00813-CJC(KESx), 2020 WL 8099514, at *10 (C.D. Cal. Nov. 30, 2020).

The Court cannot glean from the SEC's briefing that a penny stock bar is appropriate here. The SEC contends "all of the fraudulent conduct in this case involved a penny stock" and thus satisfies the statutory definition of what is considered a penny stock. [Dkt. 63 at 7]. The SEC's assertions, however, are conclusory and unsupported with any evidence. Without such evidence, the Court cannot conclude that Wellness Matrix's securities qualify as penny stock. Consequently, the Court cannot conclude Todt participated in an offering of penny stock during the relevant time period. At this time, the Court declines to impose a penny stock bar on Todt.

### E. Civil Penalty

The SEC seeks a third-tier penalty of $446,458 against Todt. The SEC contends the circumstances here justify imposing the maximum penalty of

$223,229 for two separate violations. The first is when Todt fraudulently marketed the disinfectant, and the second is when he marketed the home test kits.

As noted above, the Securities Exchange Act provides three escalating tiers of penalties for a violation of Section 10(b) and Rule 10b-5. 15 U.S.C. § 78u(d)(3)(B)(i)-(iii). After accounting for inflation, the third tier provides a maximum penalty of $223,229 for each securities violation committed by Todt. 15 U.S.C. § 78u(d)(3)(B)(iii)(aa); 17 C.F.R. § 201.1001(b).[2] Such a penalty is appropriate for each separate violation of Section 10b and Rule 10b-5 that involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii)(aa)-(bb). While the Securities Exchange Act does not define "violation," the Court has broad discretion to determine what constitutes a "violation." *U.S. Sec. & Exch. Comm'n v. Murphy*, 50 F.4th 832, 848 (9th Cir. 2022). The same considerations that help assess whether a permanent injunction is appropriate apply equally for assessing the appropriateness of civil penalties. *C3 Int'l*, 2022 WL 16814859, at 10.

The maximum civil penalty of $446,458 against Todt is appropriate here. Exploiting the uncertainty surrounding COVID-19, Todt promoted CoronaCide's home test kits and disinfectant as Wellness Matrix products. Most concerning, Todt promoted that these products were government approved. Todt acted with a high degree of scienter, knowing he would be unable to satisfy any purchase orders and that the products were not government

---

[2] *See also* Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2023), available at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm.

approved. Todt misrepresented these facts across Wellness Matrix's own and its affiliated websites. Acting on Wellness Matrix's behalf, Todt repeated these misrepresentations, along with others, to induce investors to purchase Wellness Matrix shares. During this time, Wellness Matrix's share price rose. But once the truth was revealed, Wellness Matrix's share price plummeted and created significant risk of substantial loss to investors. Throughout the litigation, Todt has not accepted the wrongful nature of his conduct and has failed to provide any assurances that he would not commit any future securities violations. The circumstances of this fraudulent scheme coupled with the fact that Todt is a repeat offender of securities laws leads to a strong inference that he will commit future securities violations.

Accordingly, a penalty of $446,458 against Todt is appropriate to deter him from engaging in similar misconduct in the future.

### F. Conclusion

For the above reasons, the SEC's motion for final judgment against Todt is **GRANTED, IN PART**. The Court will issue a separate judgment.

**IT IS SO ORDERED.**

Dated: August 10, 2023

SUNSHINE S. SYKES
United States District Judge